UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARLENE MILLER,

    Plaintiff,

v.

VILLAGE OF PINCKNEY and MICHAEL
SHEPARD, in his individual and official
capacities,

    Defendants.
_____/

Case No. 4:07-cv-10928

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT** (Docket no. 36) **AND
DENYING AS MOOT DEFENDANTS' MOTION TO DISMISS** (Docket no. 53)

INTRODUCTION

In this case brought under 42 U.S. § 1983, the plaintiff Darlene Miller alleges that the defendant, Office Michael Shepard of the Village of Pinckney Police, used unreasonable force in the course of arresting her. She also claims that the Village of Pinckney itself ("Pinckney") should be held liable for this use of force, on various grounds including failure to train and failure to supervise. The defendants have moved for summary judgment, claiming that Shepard's use of force did not violate the Fourth Amendment, or at the least, that he is entitled to qualified immunity from suit. Since Miller's claims against Pinckney are derivative of her case against Shepard, the village argues that Shepard's compliance with the Fourth Amendment requires judgment in its favor as well.

**SUMMARY JUDGMENT: LEGAL STANDARD AND FACTS**

I.  Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as to a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. *Anderson*, 477 U.S.

2

at 256. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23; *Matsushita*, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp. 214, 217 (E.D.Mich.1990), *aff'd*, 929 F.2d 701 (6th Cir.1991). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

The present case calls for the application of a more specific version of this rule, in that most of Shepard's interaction with Miller was captured on videotape by a recorder in Garbacik's police car. This video has been adduced as evidence by both parties, and the plaintiff also submitted a slow-motion version of the video.[1] In *Scott v. Harris*, ___ U.S.

---

[1] The Court is mindful that the reasonableness of Shepard's use of force ultimately depends on the facts that he actually perceived and acts he did in the heat of the incident, not the facts that he *would have* perceived had he been able to watch the video over and over at his leisure in slow motion, as the videorecording permits. Thus, the Court has considered the slow-motion video to help determine what Shepard would have seen there, but only to the extent that it is helpful in overcoming deficiencies in the full-speed videorecording – such as its relatively great distance from Miller and the presence of raindrops on the lens – that would not have affected Shepard's personal observations. Consideration of the video, however, is entirely proper to determine what Shepard actually

___, 127 S. Ct. 1769 (2007), the Supreme Court dealt with a plaintiff whose account of his seizure by the police was drastically at odds with both the defendants' version of events and a videorecording of the incident. The Court noted that in qualified immunity cases, applying the summary judgment standard "usually means adopting . . . the plaintiff's version of the facts," *id.* at 1775, but held by way of exception that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 1776. To the extent that the plaintiff's account was obviously different from the video, the Court instructed that "[t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id.* Thus, for purposes of the current motion, the Court will adopt Miller's statement of the facts, except where it is clearly belied by the videotape. The plaintiff's narrative will be supplemented by those portions of the testimony of Shepard and other officers that Miller has not contradicted with other evidence, insofar as this testimony is not inconsistent with the video.

II. Facts

Miller's claim arises from her interaction with Shepard and another police officer who were dispatched to find her after Miller had a confrontation with her ex-husband. There are three subsets of relevant facts in this case, only one of which is disputed between the parties. First, there is Miller's involvement in the incident that led to the police being dispatched to look for her; the defendants do not controvert Miller's testimony in this regard. Second are the actions and communications of the police officers between themselves and central dispatch as they searched for Miller. Miller has adduced no evidence in

---

did.

contradiction of their testimony on this topic.  Finally, there is the interaction between the police and Miller.  Here the parties sharply disagree as to the level of resistance Miller offered to the police, and the level of force they used on her.

### A.  The Incident at Miller's Ex-Husband's House

The plaintiff, Miller, has been divorced from her ex-husband for several years.  Miller dep., docket no. 36, ex. D, at p. 7.  They had children together, who on November 8th, 2006, were spending the day with their father.  *Id.* at pp 82-84.  Miller was missing her children particularly badly that day, and was upset and depressed to the point where she "felt suicidal," *id.* 84-85.  That afternoon and evening, she attempted to console herself by consuming Mike's Hard Limeade and liquor shots until she vomited.  *Id.* at 84.  Late on that rainy evening, she went to her ex-husband's house in Hamburg Township, Michigan, in hopes of seeing her children.  *Id.* at p. 87.  Miller was let into the house by her daughter, *id.* at 88, but when her ex-husband discovered her there, he asked her to leave.  She refused, *id.* at 89, and instead started screaming that she was going to kill herself, *id.* at 91.  She finally left when her ex-husband called 911.  *Id.*

### B.  Officers' and Central Dispatch's Communications and Actions In Search of Miller

At 12:19 AM on November 9th, Hamburg Township police officer Alicia Garbacik was dispatched to investigate at Miller's ex-husband's house.  Garbacik prelim. exam. testimony, docket no. 36, ex. F, at pp. 68, 101.  While she was on her way, the dispatcher informed her that the situation "was escalating."  *Id.* at 68.  In response, Garbacik asked the dispatcher to send backup – specifically, to send the defendant Michael Shepard, who as noted was a police officer in the neighboring village of Pinckney.  It appears that Garbacik was so specific in her request because she knew Shepard was the only other law enforcement officer on patrol in the area that night.  *Id.*

5

At 12:18 AM, according to Shepard's clock, central dispatch instructed him to back up Officer Garbacik. Shepard prelim. exam. testimony, docket no. 36, ex. E, at pp. 8, 23. Shepard was initially informed only that there was a domestic verbal confrontation, which designation he understood to include "the possibility it would escalate," *id.* at 8, 24, but as he approached the address the dispatcher also told him the woman (who was Miller, although Shepard did not know it at the time) was possibly suicidal, *id.* at 8, 25. At some point, dispatch also advised him that the woman was driving off in a green van, *id.* at 8-9. In response Shepard began watching for this van on the street. *Id.* at 9.

Shepard arrived at Miller's ex-husband's street before Garbacik did, and without encountering Miller's car. In consultation with Garbacik via radio, Garbacik prelim. exam. testimony, docket no. 36, ex F., at p. 70, Shepard decided not to proceed to the house, but instead waited for Garbacik to arrive, positioning his police car in a spot where he could watch nearby intersections for the green van that had been described to him. Shepard prelim. exam. testimony, docket no. 36, ex. E, at pp. 9-10. As soon as he did so, he spotted a green van coming towards him in the opposite lane, *id.* at p. 59, moving approximately the posted speed limit, which Shepard recalled as being between 40 and 45 miles per hour. *Id.* at p. 33, 62. When the van was approximately three car lengths away, Shepard activated the overhead lights on his marked police car, *id.* at p. 61; Shepard dep., docket no. 36, ex. B, at 10-12, 32; Garbacik prelim. exam. testimony, docket no 36, ex. F, at p. 71, but the van did not stop, and after it passed Shepard's car it accelerated. Shepard dep., docket no. 36, ex., B, at 11, 33. Shepard was not able to catch a glimpse of the driver's face, *id.* at 38, or to record the license plate number of the van, *id.* at 39.

Shepard did not pursue the van, *id.* at 35, but instead contacted Garbacik via their two-way radios and informed her of the situation. *Id.* at 11. Garbacik had also heard the

6

radio traffic about Miller leaving the house, Garbacik prelim. exam. testimony, docket no. 36, ex. F, at p. 69, and since Garbacik had nearly arrived at Shepard's location and had also seen the green van, they agreed that she would try to follow it while Shepard stayed at his location, in case Miller was in fact in a different car. Shepard dep., docket no 36, ex B, at p. 39. "A short time later," according to Shepard, she radioed him again, said that she had stopped the car, and relayed its registration and license plate number. *Id.* at 13. Because of the unreliability of police radios in that area, however, Shepard was unable to tell whether Garbacik had relayed her position, or what that position might be. *Id.* at 17. Shepard ran a computer check on the vehicle's license and registration, and discovered that it was registered to a Darlene Rosatti. *Id.* at 15. Then, concerned about Garbacik's safety in light of the possibly agitated and suicidal mood of the person she was pursuing, Shepard set off at once to find her. *Id.* at 17.

Due to the continued malfunctioning of their communications equipment, this action proved to be difficult. Shepard was unable to make contact with Garbacik by either police radio or Nextel two-way radio. *Id* at 17, 48. Additionally, the device in Garbacik's car that permitted her location to be tracked was not working. *Id.* at 18. At some point during this period, the dispatcher informed Shepard that Garbacik's "emergency signal button had gone off." *Id.* at 48. Garbacik stated that the emergency button sends a signal to the Michigan State Police headquarters in Lansing, which apparently in turn notifies all law enforcement officers in the relevant county of the signal. Garbacik dep., docket no. 36, ex. G, at p. 53. This signal was characterized by Shepard as "your last chance to call for help," and "very, very serious."[2] Shepard prelim. exam. testimony, docket no. 36, ex. E, at p. 48.

---

[2] It appears to have been well known among area police that their radios functioned poorly in the area where Garbacik encountered Miller, and that hitting the emergency button was the only alternative way to call for help in such a situation. Pless dep., docket

7

Shepard testified that he himself had used his emergency button only "one time in four years." *Id.* at 49. In her seven and a half years as a police officer, Garbacik had never activated her emergency button before. Garbacik dep., docket no. 36, ex. G, at p. 54.

A few minutes after this, Shepard was able to hear Garbacik say "Apache" over the radio, Shepard prelim. exam. testimony, docket no. 36, ex. E, at p. 18, along with background sounds "like something was goin' on," *id.* at 49-50. Apache was a street in the area, but Shepard did not know where it was located. *Id.* at 17-18. He relayed this to the dispatcher, who eventually was able to look up directions, and Shepard "immediately" made his way to Apache. *Id.* Approximately seven minutes after the green van had initially driven past his car, Shepard spotted Garbacik's police car and pulled up behind it. *Id.* at 38.

C. Miller's Interactions With the Police

1. Miller and Garbacik

The Court is compelled to back up the narrative of facts a bit, to return to Miller and Garbacik after Miller drove past Officer Shepard. Miller and Garbacik offer differing accounts of what happened, but Garbacik is not a party to this case, and Miller does not dispute that Shepard had no knowledge of the substance of this interaction. Suffice it to say that after she drove past Shepard and Garbacik, Miller drove her car some distance until she stopped in a driveway, feeling sick. Officer Garbacik followed her to that point and stopped her police car behind Miller's minivan. At this point the two women began their face-to-face interaction.

---

no. 39, ex. D, at pp. 12-13. This could be interpreted to lessen somewhat the objective seriousness of Garbacik's emergency signal. Nevertheless, a police officer's hitting an emergency indicator even in that area was hardly routine, as was evidenced by the overall rarity of such signals.

Although there is no dispute that Garbacik suffered no significant injuries during her personal contact with Miller, she apparently perceived Miller's demeanor as hostile and threatening. Miller admits that at one point she threw glass bottles out the window of her car when Garbacik was standing nearby; Garbacik thought Miller was throwing the bottles at her. Garbacik transcr., docket no. 36, ex. F, at p. 131. Although Garbacik knew Shepard was nearby, she could not make radio contact with him and did not know when he might arrive. Garbacik dep., docket no. 36, ex G., at p. 65. After Miller threw the bottles, Garbacik, still unable to get out any radio traffic, activated her emergency button. Garbacik transcr., docket no. 36, ex F, at pp. 80, 131. Eventually Officer Garbacik concluded that she would have to arrest Miller, and handcuffed her. Miller dep., docket no. 39, ex. E, at p. 123.

### 2. Shepard's Actions

#### a. Initial Use of Force

Just before or during the time that Garbacik was handcuffing Miller, Officer Shepard spotted Garbacik's car, pulled up behind it, and dashed toward it. Shepard dep., docket no. 36, ex. B, at pp. 37-38; Miller dep., docket no. 39, ex. E, at p. 124. This was roughly seven minutes after the green minivan had passed his car on the road. Shepard prelim. exam. testimony, docket no. 36, ex. E, at p. 38. Shepard could not see Garbacik or Miller from his car; only after getting out did he see where they were, fifty to seventy-five feet away from the place where he had initially parked. *Id.*

What happened after that time is disputed by the parties. With one notable exception discussed below, the video evidence does not conclusively corroborate either version. Therefore, the following is Miller's account of the facts, except as otherwise noted.

Miller stated that she and Officer Garbacik were standing side by side with their backs to Miller's minivan, and with Miller's hands cuffed behind her back. Miller dep. Docket no. 39, ex. E, at pp. 124, 126. Miller says she was not resisting Garbacik in any way, *id.* at p. 125-26, but the video does indicate that as Shepard arrived on the scene the two women were moving away from Miller's van in some fashion. As soon as Officer Shepard dashed up, says Miller, he struck her in the face and throat with his forearm. *Id.* at 127. Crucially, Shepard claims that when he struck Miller he "didn't realize" that she was already handcuffed. Shepard transcr., docket no. 36, Ex. E, at p.43. Miller does not contradict either this statement or Shepard's perception that "she was drunk" and that he "smelled intoxicants coming from her person," Shepard transcr., docket no. 36, ex. E, at p. 51, although the video indicates that his forearm struck her so quickly after his arrival that he would have been unlikely to notice any smells before the blow landed.

Although Miller did not testify to it, immediately after Shepard struck her the video shows him moving her forcefully toward the minivan, out of the view of the camera. A moment later, the camera captures the minivan jolting somewhat, as if Miller's body had been quickly pushed up against it. Docket no. 34, ex. A. The Court notes, however, that this jolt is relatively minor, and concludes that since Miller and Shepard are both out of view of the camera, the video evidence in the record would not permit a jury to find that he struck her against the van with any great force.

### b. Miller's Fall and Placement in the Police Car

Miller stated that Shepard and Garbacik then began to escort her back to Garbacik's police car, with one of the police officers on each side of her. Miller dep., docket no. 94 ex. E, at p. 134. As they were walking, however, she claims that one of the officers kneed her in the back, above her belt line, causing her to fall to the ground. *Id.* at pp. 137-38.

Unfortunately for this claim of Miller's, however, both of Shepard's knees are clearly visible in the video in the moments leading up to her fall and not obscured behind Miller's body, as would have been required for him to knee her in the back. The video reveals that at the relevant time Shepard was positioned to the side of her, in no position to strike the back of her body with his knee. Additionally, Shepard denies pushing or kneeing Miller in the back, Shepard dep., docket no. 36, ex. B, at pp. 32-33. On this record, the Court finds that no genuine issue of fact remains as to whether Shepard kneed Miller in the back at that time: he did not.

Moreover, even if the record did not preclude the adoption of Miller's version of these events, precedent and her previous state-court conviction might. In *Heck v. Humphrey*, 512 U.S. 477, 486-87, the United States Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." The Court gave as an example a case where a "defendant is convicted of . . . resisting arrest, defined as intentionally preventing a peace officer from effecting a *lawful* arrest," but then "brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures." *Id.* at 487 n.6. Based on the facts at issue here, Miller was convicted of two counts of violating Mich. Comp. L. Ann. § 750.81d(1), for assaulting, battering, wounding, resisting, obstructing, opposing, or endangering a police officer performing his or her duties. Although the parties have not briefed the question, it appears that this section prohibits

11

resisting even an unlawful arrest. *People v. Ventura,* 262 Mich. App. 370, 375-77 (2004). Thus, the mere fact of Miller's conviction does not preclude her Fourth Amendment claim. Shepard's contention both here and before the criminal tribunal, however, was that Miller's fall was caused not by his kneeing her, but by her intentionally going limp. It thus seems highly possible, although it is not clear to the Court on this record, that one of Miller's resisting-arrest convictions was factually predicated on her intentionally falling to the ground. If that is the case, then *Heck* precludes this Court from concluding instead that the fall was caused by Shepard's knee. Because the Court regards the record as clear on this question in any event, however, there is no need to pursue the matter further.

Although the record thus indicates that she was not kneed by Officer Shepard, Miller did fall. As a result, the officers, who had been escorting her, also both fell at least partway to the ground. *Id.* at p. 139. Miller herself hit the ground with enough force to cause her to involuntarily urinate and defecate on herself, although she has offered no evidence in contradiction of Shepard's assertion that he was unaware of this at the time. Shepard transcr., docket no. 36, ex. E, at p. 53-54. According to Miller, officers Garbacik and Shepard then shoved Miller into the police car head first. *Id.* at 141. This ended Shepard's direct contact with Miller. According to Garbacik, Shepard suffered no apparent injuries from the incident. Garbacik transcr., docket no. 36, ex. F, at p. 96.

D. Summary

After subtracting the potions of Miller's story that are clearly contradicted by the video evidence, the Court believes a reasonable jury could find that Shepard (1) struck Miller in the head and neck with his forearm, while still running toward her immediately on his arrival, (2) continued by pushing her against her minivan using a level of force insufficient standing alone to cause any significant bodily harm, and (3) a short time thereafter shoved

her into Garbacik's police car head first. The question then becomes whether, in light of the undisputed facts leading up to these occurrences, these issues are "material" – that is, whether after accepting these facts as true, Officer Shepard could be found to have violated the Fourth Amendment and to not be entitled to qualified immunity.

**FOURTH AMENDMENT AND QUALIFIED IMMUNITY**

I. The Legal Standard

Shepard claims that his actions did not violate the Fourth Amendment, or that if they did, he is entitled to qualified immunity from any suit based on them. Pursuant to Supreme Court precedent, the Sixth Circuit has explained:

> In a § 1983 action in which a defendant claims the protection of qualified immunity . . . the court must follow a two-step process in evaluating the defendant's claim of immunity. Under this analytical framework, a court must first determine whether the facts, viewed in the light most favorable to the plaintiff, could support a finding that the defendant has violated the plaintiff's constitutional rights. If the facts would support a finding of a constitutional violation, the court must also find that the conduct of the defendant violated "clearly established" constitutional rights. If, however, the plaintiff is unable to establish sufficient facts to support a finding of a constitutional violation by the defendant, the inquiry ceases, and the court must award judgment to the defendant.

*Williams v. City of Grosse Pointe Park*, 496 F. 3d 482, 485 (6th Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In *Saucier*, the Supreme Court clarified that this two-step process remains the same even in the Fourth Amendment context, with the second step focusing not on the abstract reasonableness of the officer's conduct, but instead on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Under this inquiry, [i]f an officer's mistake as to what the law requires [in a given situation] is reasonable . . . the officer is entitled to the immunity defense." *Id.* at 205.

13

In light of these standards, the Court will examine the merits of Miller's Fourth Amendment claim, reading the facts in the manner discussed above, as favorably to Miller as the record will bear.

II. Analysis

Miller claims that Shepard's use of force was great enough to render his seizure of her person an "unreasonable" one, within the meaning of the Fourth Amendment to the United States Constitution. The Supreme Court has held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989). This "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Crucially in this case,

> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments– in circumstances that are tense, uncertain, and rapidly evolving– about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (quoting *Johnson v. Glick*, 481 F. 2d 1028, 1033 (2d Cir. 1973).

In determining whether the facts of a case justified the use of a given level of force, the "perspective of a reasonable officer" that a court is required to adopt includes any reasonable mistakes that an officer might make. The Supreme Court has elaborated that "[e]xcessive force claims, like most other Fourth Amendment issues, are evaluated for

14

objective reasonableness based upon the information the officers had when the conduct occurred." *Saucier*, 533 U.S. at 207. The *Saucier* Court used language even more precisely applicable to this case: "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Saucier*, 533 U.S. at 205. The Sixth Circuit has acknowledged that even if police use force under a misconception of the facts, the reasonableness of the force used should be evaluated in light of the facts as they believed them to be (provided the misconception was itself a reasonable one). In *Dickerson v. McClellan*, 101 F. 3d 1151 (6th Cir. 1996), the court evaluated the reasonableness of the force used by officers who had been told that the suspect "had fired nine gunshots." *Id.* at 1155 n.3. The suspect was killed in the incident, and at the trial for the Fourth-Amendment violation his children, the plaintiffs, adduced evidence that the suspect had not actually fired the gun. The Court noted that the parties had stipulated to the fact that the gunshots had been fired, *id.*, but also observed that " we must consider only the facts the officers knew at the time of the alleged Fourth Amendment violation," *id.*, and thus evaluated the reasonableness of their conduct from that perspective.

Applying this standard, the Court is unable to conclude that Shepard's actions constituted an unreasonable use of force, even when the facts are read in the light most favorable to Miller. Objectively speaking, the force used by Shepard was no doubt greater than necessary in light of the fact that Miller was handcuffed and (according to her version of the facts) offering no resistance as he arrived on the scene. His uncontradicted testimony, however, was that he had no knowledge of these circumstances until some time after he arrived. The only information Shepard had when he struck Miller was that his fellow officer was dealing with a suicidal woman who had gotten in a fight with her ex-

15

husband and then had failed to stop her vehicle when he activated his police car's emergency lights, and that after she went off in pursuit of this woman Garbacik had activated her emergency signal for the first time in years. It was only after he had begun to move from his patrol car toward Miller's minivan that he was able to see Garbacik and Miller, and either before or immediately after spotting them he broke into a sprint. Shepard's uncontradicted statement was that he in fact did not know she was handcuffed. Even if, as Miller claims, she was not struggling with Garbacik as Shepard approached and instead was completely compliant, Shepard would have had only a few seconds at best to make this observation through the darkness and the rain as he dashed toward the two women. The video reveals that the two women were at least moving as Shepard approached, and under the circumstances Shepard could not have come to anything but a tentative conclusion that Miller was no longer a threat to Garbacik's or his own safety. In light of the previous indications of the dangerousness of the situation, the Court concludes that such a fleeting observation would not have been enough to render objectively unreasonable a forearm to the neck and face, or a quick push up against the side of a car. Under the facts read most favorably to Miller, this appears to be the sort of case in which "the officer reasonably, but mistakenly, believed that a suspect was likely to fight back," and as a result was "justified in using more force than in fact was needed." *Saucier*, 533 U.S. at 205.

Miller's claim that Shepard shoved her head-first into Garbacik's police car then remains for consideration. By this time, Shepard had undisputedly discovered that Miller was handcuffed, and that (under Miller's version of the facts) she was not continuing to resist arrest. Nevertheless, his undisputed experiences with Miller up to that point establish that Shepard would have been amply justified in continuing to believe that she would be

an uncooperative and potentially violent arrestee, who might require firm treatment. Miller has not claimed that the headfirst shove was particularly brutal, or that it caused her to suffer any specific injury. In the absence of any such indication, the Court concludes that the record evidence does not establish that shoving Miller into the car violated the Fourth Amendment either.

Because the Court concludes that Shepard did not violate the Fourth Amendment, there is no need to conduct the second step in the qualified-immunity analysis.

## CONCLUSION AND ORDER

Read in the light most favorable to the plaintiff, the facts in the record establish that Shepard reasonably believed Miller to be seriously dangerous when he pulled up in his police car near the scene of her interaction with Officer Garbacik, and that he had insufficient time and evidence to correct this perception by the time he actually arrived on the scene and struck her. In that light, the force that the record indicates he used was not unreasonable under the Fourth Amendment. As a result, his motion for summary judgment will be granted. Since Miller's claims against Pinckney are entirely derivative of her claim against Shepard, summary judgment will also be granted in favor of the village. Finally, in light of the grant of summary judgment, the defendants' motion to dismiss the case for Miller's alleged failure to comply with a discovery order, docket no. 39, will be denied as moot.

**WHEREFORE**, defendants' motion for summary judgment is hereby **GRANTED**, and their motion for dismissal is **DENIED AS MOOT**.

**SO ORDERED.**

s/Stephen J. Murphy, III
Stephen J. Murphy, III
United States District Judge

Dated: December 22, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 22, 2008, by electronic and/or ordinary mail.

Alissa Greer
Case Manager